FILED
12/16/15 3:30 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| ALL MATTERS RELATED TO NORTH | : | Misc. Case No. 15-00204-TPA |
| AMERICAN REFRACTORIES COMPANY, | : | |
| *et al.* in Case No. 02-20198, as affected by the | : | |
| May 24, 2013 Order Entering Final Decree | : | |
| entered at Doc. No. 7940, | : | |
| *Debtors* | : | |
| | | |
| HONEYWELL INTERNATIONAL, INC., | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | Related to Doc. No. 63 |
| | : | |
| NORTH AMERICAN REFRACTORIES | : | |
| ASBESTOS PERSONAL INJURY | : | |
| SETTLEMENT TRUST, | : | |
| *Defendant* | : | |
| and | : | |
| | : | |
| FUTURE CLAIMANTS' REPRESENTATIVE: | | |
| AND NORTH AMERICAN REFRACTORIES: | | |
| COMPANY ASBESTOS TRUST ADVISORY: | | |
| COMMITTEE, | : | |
| *Intervenors* | : | |

*Appearances*:  Peter J. Sacripanti, Esq., for the Plaintiff
Joseph T. Baio, Esq., for the Defendant
Edwin J. Harron, Esq., Intervenor Future Claimants' Representative
Leslie M. Kelleher, Esq., for Intervenor NARCO Asbestos Trust Advisory Committee

## **MEMORANDUM OPINION**

Presently before the Court for decision following an extensive hearing, briefing, and

argument is the ***Motion for Preliminary Injunction*** ("Motion") filed by the Plaintiff, Honeywell

International, Inc. ("Honeywell") on July 13, 2015 at Doc. No. 63.  For the reasons that follow, the

Court finds that the *Motion* will be denied.  Additionally, although none of the Parties have raised it, as expressed at the argument, the Court itself has some concerns as to whether it has subject matter jurisdiction in this case and will require that issue to be addressed before the case proceeds further.

## GENERAL BACKGROUND

The dispute in this case  stems from the bankruptcy of North American Refractories Company, or "NARCO," that was filed in this Court on January 4, 2002, at Case No. 02-20198.[1] For many years, NARCO was a manufacturer of refractory products such as bricks, mortars, cements, etc., that were designed for use in high-temperature industrial applications, primarily furnaces and boilers.  Some of the products manufactured by NARCO included asbestos among their ingredients.  In a corporate transaction whose details are not significant for present purposes, Honeywell effectively became the parent of NARCO in 1986.

Prior to and following Honeywell's acquisition of NARCO,  many tort claims were filed involving diseases such as mesothelioma and other forms of cancer that were alleged to have been caused by exposure to asbestos contained in NARCO products.  As part of the acquisition, there was an agreement between NARCO and Honeywell that acted to allocate responsibility between the two entities for these asbestos claims depending on the product involved in the

---

[1]      In addition to NARCO itself, a number of its subsidiaries also filed petitions for relief of their own in January, 2002.  Also, the NARCO bankruptcy was jointly administered with the related cases of Global Industrial Technologies, Inc. ("GIT"), Case No. 02-21626 and the cases of a  number of GIT's affiliates.  The present dispute relates only to the NARCO case.

particular claim.  The agreement, as modified over time, functioned for a considerable period after the acquisition, but disputes between Honeywell and NARCO as to its scope and implementation eventually led to its termination in late 2001.  As asbestos tort claims continued to be filed in larger numbers, the financial burden on NARCO and its parent corporation, Honeywell, was the precipitating reason for the bankruptcy filing.

On November 13, 2007, this Court, acting through the Honorable Judith K. Fitzgerald, entered an Order confirming the Third Amended Plan of Reorganization for NARCO ("the Plan").  *See*, NARCO main case Doc. No. 5508.  That same date Judge Fitzgerald issued a Revised Memorandum Opinion ("RMO"), which  included as Exhibit 1 Revised Findings of Fact and Conclusions of Law ("RFFCL").  *See*, main case Doc. No. 5507.  The RMO and RFFCL together provide extensive information as to the procedural history of the case and the relevant factual background.  The Court will refer freely to the RMO and the RFFCL where relevant.

### *The NARCO Trust*

A key part of the Plan was the creation of the NARCO Asbestos Trust ("Trust") pursuant to *11 U.S.C. §524(g)*, along with a corresponding "channeling injunction" that would serve to direct to the Trust all asbestos-related claims against NARCO, and Honeywell, that might otherwise have been brought as tort claims in the courts.

The Trust is to be a vehicle for the "equitable payment" of such asbestos-related claims, both "Pre-Established Claims" (generally speaking, those that had been settled or otherwise liquidated prior to the effective date of the Plan, which claims are not at issue with respect to the

3

*Motion*)  and all other claims.  The Trust is governed by the NARCO Asbestos Trust Agreement ("TA") and the NARCO Asbestos Trust Distribution Procedures ("TDP"), documents that were the product of extensive negotiation among the various constituent groups interested in the case.

The Trust is funded by receiving 79% of the common stock of the reorganized debtor entity, known as Reorganized ANH, and by cash payments to be made into the future by Honeywell. The Trust includes two claim funds, one the "Pre-Established Claim Fund" into which Honeywell must pay, without limit, whatever is necessary to pay all Pre-Established Claims; the other, the "Annual Contribution Claims Fund" for payment of all remaining claims.

As to the Annual Contribution Claims Fund, Honeywell is to pay into it as necessary to enable the Trust to pay the other claims, up to an annual cap amount, varying over time and ranging from $100 to $150 million.  The Parties are in agreement that to date Honeywell has not had to pay anything into the Annual Contribution Claims Fund because thus far the Trust's existing assets have been sufficient to pay claims, though it is expected that beginning in 2016 Honeywell will have to start contributing monies per its agreement.  In addition to its payment obligations as to the two claim funds, Honeywell is also obligated to pay for the administration of the Trust.

There are three trustees of the Trust.  The initial group of Trustees, which remains in place to the present day, consists of Atty Richard Schirro, Mark Gleason, and the Hon. Ken Kawaichi.  The Trustees are, of course, to act as fiduciaries and to administer the Trust in accordance with the TA and the TDP.  Although the Plan was approved in 2007 and the Trustees were appointed at that time, due to delay caused by an appeal of the Plan confirmation, and the need

4

for the Trust to develop an administrative framework for reviewing claims, it took several years for the Trust to become operational, with the first payment of claims beginning in early 2014. To assist it with the review and processing of claims, the Trust hired an entity known as CRMC to be its claim processor.

The Parties are in agreement that the Trust differs in a significant respect from asbestos-related trusts that have been created in other bankruptcy cases under the authority of *Section 524(g)*. Typically, such trusts are funded by a fixed payment made into the trust by the settlor, who then essentially walks away and has no further role or interest in how the trust is administered and pays claims. The Trust in the present case by contrast is "evergreen" in the sense that Honeywell's payment obligation, except for the annual caps mentioned above, is ongoing and "unlimited" until termination of the Trust.[2] This makes the Trust unique, or at least highly unusual, among asbestos-related trusts, and serves as a basis for Honeywell to have a continuing interest in how the Trust is being operated, as recognized by certain rights set forth in the TA and TDP.

The various disputes in this case all relate to the operation of the Trust. Honeywell's very comprehensive Complaint includes allegations that the Trust is breaching the "exposure

---

[2]    There is not a set date provided in the TA for the termination of the Trust, and thus of Honeywell's funding obligation. Instead, the Trust can be terminated if the Trustees unanimously decide to do so because they believe no further claims will be filed, or if they have provided insurance to cover any remaining claims, or, if 2/3 of the Trustees, plus Honeywell, and the Intervenors agree to terminate. *See*, TA at Art. 8.3(a). Apparently as a last resort and to guard against any perpetuity issues, the Trust will also terminate "21 years less 90 days pass after the death of the last survivor of all the descendants of Joseph P. Kennedy, Sr. of Massachusetts living on the date hereof." *Id.* At the closing argument, Counsel for Honeywell estimated a probable life-span for the Trust of 30 to 40 years.

5

standard"and the "competent evidence standard" for certain claims as set forth in the TDP (*See* Counts I-IV), that the Trust has violated "consultation and consent" provisions in the TA and the TDP (*See,* Count V), and that the Trust breached the TDP by failing to honor Honeywell's audit rights (*See,* Counts VI-VII).   In addition, the Honeywell Complaint seeks declaratory relief with respect to the "Individual Review" component of the TDP (*See,* Count VIII) and its "Litigation Rights" under the TA (*See,* Count IX).  The *Motion* itself, however, is narrower in scope, essentially being limited to the issues laid out in Counts I through IV of the Complaint.

### *Claims Under the Trust*

To better understand the dispute between the Parties as involved in the *Motion*,  it will be helpful to take a step back and first look at the big picture.  As indicated above, there are two separate  claim funds under the Trust, one to pay Pre-Established Claims and the other to pay all remaining claims.  The issues raised by the *Motion* involve only claims payable from the latter, the Annual Contribution Claims Fund.  Claims payable out of that fund may be further broken down into those filed under the "Expedited Review" process, *See,* TDP §4.3(a), and those filed under the "Individual Review" process, *See,* TDP §4.3(b).   In broad terms, claims filed under the  Expedited Review process are subject to an "expeditious" and "less burdensome" approval and if approved can result in payments of a fixed but relatively modest amount,[3]  depending on the disease level involved.  Claims filed under the Individual Review process are subject to a more probing inquiry

---

[3]    Scheduled amounts for approved Expedited Review claims range from $1200 for "other asbestos disease" to $75,000 for "mesothelioma."

but can result in a much larger payment if granted.[4]   The *Motion* involves only the subset of claims

filed under the Expedited Review process.

Expedited Review claimants are required to provide both medical evidence

demonstrating the disease suffered by the claimant,[5] and exposure evidence.  The dispute involved

in the *Motion* relates only to issues involving the exposure element of evidence.  The relevant

provision of the TDP to be considered is Section 4.7(b), entitled "Exposure Evidence."  A copy of

this complete provision is attached to this Opinion as Appendix "1".  Within Section 4.7(b), the

following key phrases are involved:

- "the claimant must submit requisite evidence of exposure to a specific asbestos-containing product manufactured, sold or distributed by NARCO or its predecessors, which includes demonstrating both the presence of such products at a particular site at a particular time and the claimant's occupational exposure to that product." [In Section 4.7(b)(1)]

- "In order to demonstrate exposure to the NARCO asbestos containing product at the relevant site, a claimant must submit competent evidence that he or she worked on a regular basis with the NARCO asbestos containing product or worked on a regular basis in close proximity to workers engaged in the activities set forth in Section 4.7(b)(2)(a) through (c)." [In Section 4.7(b)(1)]

---

[4]     For instance, a claim payment for mesothelioma under Individual Review can be up to $1 million.

[5]     Claims can be filed by the individual who allegedly suffered the disease, or by a spouse, other family member or personal representative if the individual has died or is incompetent. In this opinion, for convenience the Court uses the shorthand of "claimant" only, though it should be recognized that in certain instances the medical and exposure evidence may actually concern someone other than the claimant.

Honeywell argues, and the Trust largely agrees, that the first phrase quoted above establishes that there are actually two prongs to the exposure evidence requirement under the TDP: the presence prong and the occupational exposure prong.  First, the claimant must establish that NARCO asbestos-containing products ("NACP") were present at the work site where the claimant was employed during the relevant period of time.  This presence  prong can be met either by showing that the claimant worked at a site on the "Work Site List"[6]  during the identified period of time, or for those sites not on the List, by providing credible evidence that a specific NACP was present at the site.  Second, the claimant must also show that the claimant had occupational exposure to a specific NACP.  Occupational exposure is presumed if the claimant worked in certain occupations, but otherwise must be demonstrated.  Honeywell argues that these two prongs are conceptually distinct, and that it would be quite possible for  NACP to have been  present somewhere  on a large work site, without a claimant ever having been exposed to them  because he or she worked elsewhere on the site.

### Occupational Exposure Issue

The first issue raised in the *Motion* relates to how the Trust seeks to address the exposure evidence requirement when reviewing  a subset of Expedited Review claims in which the claimant worked at a site on the Work Site List, thereby establishing the presence prong,  but was

---

[6]        The Work Site List appears as an attachment to the TDP.  It consists of sites that Honeywell agreed had NACP present, and of sites  for which Honeywell had settled asbestos claims in the tort system before the NARCO petition date in which the plaintiff had alleged NACP were present.  *See,* Appendix 1, TDP Section 4.7(b)(1) at footnote 10.

not in one of the presumptive occupations for purposes of establishing occupational exposure and

does not identify a specific NACP.  More specifically, the Trust would find that such claimant could

possibly meet the occupational exposure requirement by submitting evidence to show the claimant

worked around or in the vicinity of "refractory products," even though no specific NACP has been

identified.  Honeywell has dubbed this the "refractory inference" and argues that it violates the TDP

and results in an improper expansion of the universe of claims that can be approved.[7]   The Trust

takes the position that Honeywell has mischaracterized and oversimplified the way it (the Trust)

would review this subset of Expedited Review claims since presently it is looking at the totality of

circumstances in each case and not just whether the claimant mentions refractory products.  The

Trust argues that it is acting within its discretionary authority.

### *Competent Evidence Issue*

The second issue raised in the *Motion* is the meaning of the term "competent

evidence" as used in the second quoted phrase from the TDP concerning the exposure requirement

for Expedited Review claims.  Honeywell takes the position that this is a term of art that should be

construed as meaning the Trust can only consider evidence that would be admissible in a judicial

proceeding.  Thus, Honeywell argues that, for example, affidavits and the like based on hearsay

rather than personal knowledge are not competent evidence to support a claim.  The Trust counters

---

[7]     In its Complaint, Honeywell alleged that the refractory inference had been deliberately implemented by the Trust in such a manner so as to be hidden from Honeywell. Whatever else the merits of Honeywell's case may ultimately prove to be, the evidence at the hearing did not support that contention. When that became obvious at the hearing, to its credit Honeywell voluntarily withdrew any such allegation.

that this is too stringent a standard, and that instead the scope of evidence that it may consider is broader than that which would be judicially admissible.

### Current Status of Claims

The above are the two main issues the Court must consider when deciding whether to grant the *Motion* and issue a preliminary injunction that would to some extent dictate how the Trust is to process claims pending a final decision in this case.  Before turning to a legal discussion of those issues, however, it must be noted that as a result of the litigation process, including expedited discovery, that has been ongoing for several months since the *Motion* was filed  has had the salutary effect of getting the Parties to significantly narrow the scope of their dispute.

The *Motion* itself refers to 481 pending claims totaling approximately $10.2 million as being at issue.[8]  Those numbers have been whittled down over the course of the litigation so far, in part by the Trust's voluntary agreement to stop accepting certain "check-the-box" or "form" affidavits as sufficient to support a claim, and in part by Honeywell's voluntary agreement not to oppose the Trust's payment of certain claims that had formerly been among those it was opposing. The net result of that cooperative effort is that the number of disputed claims has now been reduced to less than 30, with a collective total potential value of approximately $750,000.  Additionally, the Trust has represented to the Court, and to Honeywell, that even in the absence of a preliminary

---

[8]      Prior to the filing of the present case, Honeywell and the Trust had engaged in ADR, as required by the TA, in an unsuccessful effort to resolve their differences.  During that process, the Trust agreed to put the disputed claims under a voluntary "hold" on payment.  It was the impending termination of that hold that caused Honeywell to file the Complaint and *Motion*.  The Trust agreed to continue the hold pending a decision on the *Motion*.

injection it will not employ a "refractory inference" during the pendency of the case in the form

that Honeywell found so objectionable.  These movements in position reflect well on the Parties and

the Court commends them for it.  The practical result of the foregoing is that since the filing of this

matter the Court has been afforded the opportunity to considerably narrow its focus in rendering this

Opinion and entering the Order accompanying it.


## DISCUSSION

Preliminary injunctive relief is an "extraordinary remedy" that should be granted only

in limited circumstances, and never as of right.  *Groupe SEB USA, Inc. v. Euro-Pro Operating, LLC*,

774 F.3d 192, 197 (3d Cir. 2014), *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*,

765 F.3d 205, 209 (3d Cir. 2014).  In order to obtain  preliminary injunctive relief, the party seeking

it, here Honeywell, must establish:

- a likelihood of ultimate success on the merits;

- a likelihood it will suffer irreparable harm in the absence of
  preliminary relief;

- that the balance of equities tips in its favor; and

- that a preliminary injunction is in the public interest.

*Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008).  The failure to establish

any element can render a preliminary injunction inappropriate.  *Id. See also Ferring*

*Pharmaceuticals*, 765 F.3d at 209.  The court in *Winter* also stressed that in each case a court must

"balance the competing claims of injury and must consider the effect on each party of the granting

or withholding of the requested relief."   555 U.S. at 24 (quoting *Amoco Production Co. v. Village of Gambell, Alaska, et al*, 480 U.S. 531 (1987)).   Courts are also to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcello*, 456 U.S. 305, 312 (1982)).

The Court will begin its examination of the required elements, in the context of the present case, with the irreparable harm factor because it finds that Honeywell's *Motion* founders most obviously regarding that issue.

### *(A)  Irreparable Harm*

The irreparable harm requirement for a preliminary injunction is met if a plaintiff demonstrates a significant risk that it will experience harm that cannot adequately be compensated for after the fact by monetary damages. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000).   The *Adams* court went on to comment that this is not an easy burden to meet, *id.*, and in finding that the plaintiffs involved in the case had not met their burden, it stated:

> An important factor animating our holding is our respect for the extraordinary nature of the preliminary injunction power. We have repeatedly insisted that the use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter, and the preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm.   The Supreme Court, moreover, has instructed that the tool of the preliminary injunction should be reserved for "extraordinary" situations.   And as we have previously stated, "[t]he *dramatic and drastic power* of injunctive force may be unleashed only against conditions generating a presently existing actual threat."

204 F.3d at 487 (citations omitted, emphasis added by *Adams* court).

12

An important corollary that follows from the general rule stated above is that ordinarily an injury that is measured solely in monetary terms cannot constitute the sort of "irreparable harm" that is required for the issuance of a preliminary injunction. *See, e.g., Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009) ("We have long held that an injury measured in solely monetary terms cannot constitute irreparable harm.").

On its face, this presents a clear problem to Honeywell in the present case because the only harm it is claiming as a result of the complained of actions of the Trust is monetary. Specifically, Honeywell argues that without preliminary injunctive relief the Trust will improperly pay claims, resulting in Honeywell having to expend more money in its contributions to the Trust than it otherwise would have to expend if the TA and the TDP were being faithfully implemented. Honeywell alleges no other type of harm but a monetary one.  How then does Honeywell propose that it has established the existence of irreparable harm?  Honeywell asserts that the monetary loss it will experience cannot subsequently be recovered once the Trust pays the disputed claims and therefore argues that this feature distinguishes this case from the *Liberty Lincoln-Mercury* corollary noted above.

In other words, if no preliminary injunctive relief is granted, and if Honeywell's position on the proper standard to be applied in evaluating the claims at issue is upheld over the approach that the Trust would otherwise apply, in the meantime the Trust will presumably have paid out a number of claims that by right should not have been paid.  Furthermore, it appears to be undisputed that once such claims are  paid, absent claimant fraud, they cannot subsequently be recovered from the claimant if it is later determined that an improper standard was used by the

13

Trust.[9]   It is not entirely clear to the Court whether this irretrievability is based on an actual legal impediment to recovery from claimants, or whether it would merely be impractical for some reason to seek a recovery, but either way for present purposes it is assumed that once a claim is paid by the Trust the money cannot be recovered from the claimant.  Finally, even though Honeywell has not yet had to expend any of its money to fund claim payments from the Annual Contribution Claims Fund by the Trust because other Trust resources have not yet been exhausted, it is only a matter of time before that will happen, likely sometime in 2016.  For the sake of simplicity the Court will presume that the cost of all of the irretrievable claim payments will be borne by Honeywell.

Assuming, *arguendo*, that Honeywell will  succeed on the merits, the question for the Court then becomes whether the improper but irretrievable claim payments that would be made by the Trust pending a final decision in this case would constitute irreparable harm to Honeywell sufficient to support the issuance of a preliminary injunction.

---

[9]      The Court also notes that it is not entirely clear that any monetary loss Honeywell may experience in the absence of a preliminary injunction will necessarily be unrecoverable,  even if it is assumed that for legal and/or practical reasons a recovery cannot be made from the claimants who were improperly paid.  The Parties did not address this point in their filings or evidence, but the general rule is that a trustee is accountable in damages for a breach of trust.  *See, e.g., U.S. v. Jicarilla Apache Nation*,__ U.S. __, 131 S. Ct. 2313, 2340 (2011).  The TA itself contemplates that the Trustees can be liable for their own breach of trust "committed in bad faith."  TA at Art. 5.4. Does Honeywell, as a settlor of the Trust, have standing to pursue a damage action against the Trustees for breach of trust?  Possibly.  *See, e.g., Wilmington Trust Co. v. Carpenter*, 168 A.2d 306, 309 (Del. 1961) (stating that law is not settled as to whether a settlor has standing to "call the trustee to account" regarding enforcement of a trust agreement, but assuming that in some circumstances a settlor might have such standing).  To the extent there is any possibility as to Honeywell's ability to seek recovery from the Trustees, that only further strengthens the Court's conclusion that Honeywell has failed to demonstrate irreparable harm.

As noted, a purely economic injury that is compensable in money generally does not satisfy the irreparable injury requirement. *See, e.g., Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 255 (3d Cir. 2011). Some courts have recognized, however, that in certain instances when an economic injury will not be recoverable, that may be enough to support a finding of irreparable injury to support the entry of a preliminary injunction. The key inquiry in such cases is whether the unrecoverable economic injury is of such nature or magnitude that it will cause serious or special harm to the plaintiff, for example by threatening the plaintiff's solvency or requiring it to undergo substantial changes in its operations. Absent such a significant impact, a purely economic injury even if unrecoverable, is insufficient irreparable harm to justify preliminary injunctive relief.

For instance, in *Coca-Cola Bottling of Shreveport, Inc. v. Coca-Cola Co.*, 563 F. Supp. 1122 (D. Del. 1983), the plaintiffs were regional bottlers that were involved in a dispute with the defendant soft drink manufacturer ("Coca-Cola") surrounding the latter's introduction of the then-new "Diet Coke." The relationship between Coca-Cola and various bottlers around the country was governed by contracts that were established pursuant to a 1921 consent decree, which contracts included pricing formulas for the syrup that Coca-Cola sold to the bottlers who then used it to make soft drink products. The dispute at issue concerned Diet Coke syrup, and whether its sale was subject to the provisions of the existing contracts.

Coca-Cola took the position that the Diet Coke syrup was not within the scope of the existing contracts, and that therefore new terms with "flexible pricing" would have to be developed. When some bottlers objected and argued that they should be entitled to buy the Diet Coke syrup under the terms of the existing contracts, Coca-Cola proposed a "Temporary

15

Amendment" to the existing contracts as an interim measure. Under the Temporary Amendment, Coca-Cola would sell the Diet Coke syrup to the bottlers at a set price (higher than under the existing contracts), without prejudice to the bottlers being able to challenge in court whether the existing contracts, in fact, controlled. The Temporary Amendment also provided, however, that the bottlers irrevocably waived any right to seek reimbursement of any overcharges they incurred in the interim should it ultimately be judicially determined that the pricing under the existing contracts controlled.

The plaintiff bottlers in the *Shreveport* case refused to sign the Temporary Amendment with this waiver of damages provision included. They sought a preliminary injunction whereby the Court would permit them to buy the Diet Coke syrup at the price offered in the Temporary Amendment, but without having to waive their right to seek recovery of any overcharges that might accrue during the case. The *Shreveport* court found or assumed that the bottlers had shown a likelihood of success on the merits, and it then turned to the issue of irreparable harm. The bottlers pointed to a number of potential harms, but the court found that all of them could be eliminated by signing the Temporary Amendment, leaving as the sole remaining question for the court whether the "irrevocable loss of monetary damages [can] justify the grant of a preliminary injunction?" *Id.* at 1141.

In answering that question in the negative, the *Shreveport* court quoted as follows from a Third Circuit case that it stated had addressed that very question:

> Without intending to disparage the importance of such an injury [i.e., unrecoverable costs], we observe that all that is lost is profits. Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it

could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way 'peculiar.' These are not 'small' corporations; there is no contention that compliance . . . would render any appellee unable to meet its debts as they come due. Nor is there any contention that the cost of compliance would be so great vis-a-vis the corporate budget that significant changes in a company's operations would be necessitated. Nor is this a case where compliance would permanently injure the corporation's reputation, or its goodwill.

*Id.* (quoting *A.O. Smith Corp. v. Federal Trade Commission*, 530 F.2d 515, 527–28 (3d Cir. 1976).

It is apparent from the above quote that the *A.O. Smith* case arose in the context of unrecoverable costs that would be incurred by the plaintiff in complying with a governmental regulation that it was challenging. The *Shreveport* court nevertheless found the basic principle set forth in *A.O. Smith* to be equally applicable in a private breach of contract action. Thus, the *Shreveport* court found that to justify the grant of a preliminary injunction on the basis of irreparable harm premised on an irrevocable monetary loss, the bottlers would have to show that the loss they would suffer if the waiver language were not enjoined would be "special, peculiar, or work an onerous hardship." 562 F. Supp. at 142. Finding no such showing had been made, the *Shreveport* court denied the requested preliminary injunction. *See also, e.g., Northern Air Cargo v. U.S. Postal Service*, 756 F. Supp. 2d 116, 125 (D.D.C. 2010) (plaintiff alleging irrecoverable loss must nevertheless also demonstrate that its business would suffer "great" harm in the absence of interim injunctive relief; put another way, the injury must be more than simply irretrievable, it must also be serious in terms of its effect on the plaintiff); *Sterling Commercial Credit-Michigan, LLC v.*

*Phoenix Industries I, LLC*, 762 F. Supp. 2d 4, 8 (D.D.C. 2011) (even unrecoverable losses must have a "serious" effect on plaintiff in order to be considered irreparable for purposes of preliminary injunction);  *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145 (D.D.C. 2012) *vacated and remanded*, 493 F. App'x 108 (D.C. Cir. 2012) (fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm; harm must also be "great, certain, and imminent").

The Court sees no reason why this test should not be applied in the present case to determine whether unrecoverable monetary loss can suffice to show irreparable harm.  As indicated above, the Court will assume that Honeywell has demonstrated that it will incur economic loss that cannot be recovered if a preliminary injunction is denied and the Court ultimately finds in its favor on the merits.  The question though, is whether it has also demonstrated that such loss would have a special, peculiar or particularly damaging effect on its business operations beyond a simple diminution in profits. The Court finds that Honeywell has failed to make such a demonstration. There was absolutely no evidence presented at the hearing on the *Motion* that the amount of potentially unrecoverable loss that is at issue here would threaten Honeywell's solvency,  seriously damage its business operations, or cause it any other  sort of special, onerous or peculiar hardship, such as damage to its goodwill or reputation.

Furthermore, it is highly doubtful that Honeywell could have made such a showing even if it had tried to do so. When the *Motion* was filed, Honeywell alleged that there were several hundred disputed claims with a collective value of approximately $10.2 million that were subject to the voluntary "hold" it had negotiated with the Trust during the ADR proceedings that the parties

had engaged in prior to the filing of this case.  *See*, *Motion* at ¶24. That would have represented the ceiling of possible unrecoverable loss by Honeywell under an unlikely "worst case" scenario in which the Trust paid every disputed claim once the hold was lifted and it was later determined that none should have been paid.  As was mentioned previously, however, since the filing of the *Motion*, through discovery and discussions between the Parties,  many of these claims have been resolved to the satisfaction of Honeywell.  The universe of pending claims in dispute for purposes of the *Motion* has been reduced to less than 30, with a collective value of approximately $750,000, making that the new ceiling for Honeywell's possible unrecoverable loss.[10]

While $750,000 million might be viewed as a large amount from the perspective of an individual person or a small business, the Court must view it within the context of Honeywell's overall financial condition, including its financing commitment to the Trust.  *See, e.g., Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 123 (D.D.C. 2007) (monetary figures are relative, and depend for their ultimate quantum, on a comparison with the overall financial wherewithal of the corporation involved).   Honeywell did not provide any evidence going to its general financial

---

[10]      The Parties  focused on the value of the potential loss at issue based on the pool of claims that was subject to the hold.  Perhaps additional claims that would fall into the same category as the hold claims have been filed with the Trust since then – and more claims may yet come in until such time as the case is resolved – which could increase the amount "at issue," thus benefitting Honeywell's position as to the irreparable harm factor.  In fact, counsel for Honeywell mentioned that possibility at the closing argument on the *Motion*.  No quantitative or other evidence, however, was ever presented in that regard, as was incumbent upon Honeywell to do if it wanted such possible claims to be considered.  The Court will not base its decision on mere speculation.  Since the *Motion* is being denied without prejudice, Honeywell is always free to seek preliminary injunctive relief in the future based on additional claims.

condition.[11]

There is, however, evidence of record going to the  level of financial commitment that Honeywell made in agreeing to fund the Trust.  The Trust  points out that Honeywell's own expert in support of Plan confirmation, Doctor Francine Rabinovitz, filed a declaration under penalty of perjury, which was credited by the Court in confirming the Plan, in which she opined that the present value of the contributions that Honeywell could expect to pay out over the Trust's lifetime in satisfaction of the financial commitment it was making was approximately $2.37 billion.[12]  *See,* RFFCL  at ¶164.  As such, an unrecoverable loss of $750,000  represents approximately a mere .03% of Honeywell's total voluntary financial obligation concerning the Trust.  Even if viewed more

---

[11]    Although Honeywell did not present any evidence of its general financial condition, the Court is permitted to take judicial notice of properly authenticated public disclosure documents filed with the United States Securities and Exchange Commission ("SEC").  *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).  The SEC provides public access to such documents through its Electronic Data Gathering , Analysis, and Retrieval ("EDGAR") System.  *See, Love v. Alfacell Corp*., 2011 WL 4915874 *1 at n.3 (D. N.J. Oct. 17, 2011).  EDGAR can be accessed online at http:// www.sec.gov/searchedgar/webusers.htm.   The availability of the report on a government website is sufficient for purposes of authentication.  *See, e.g., U.S. v. Joyce*, 2008 WL 2367307 (W.D. Pa. June 10, 2008) (court referred to census data from census.gov  government website); *Berry Plastics Corp. v. Intertape Polymer Corp*., 2015 WL 8131080 (S.D. Ind. Dec. 4, 2015) (a document posted on a government website is presumptively authentic if government sponsorship can be verified by visiting the website itself).  The most recent 10-K Annual Report Honeywell filed with the SEC, (found at  http://www.sec.gov/Archives/edgar/data/ 773840/000093041315000621/0000930413-15-000621-index.htm), indicates that in approximate terms for the year 2014 Honeywell had net sales of  $40.3 billion, net income of $4.2 billion, and shareholders' equity of $17.7 billion. Honeywell 2014 10-K Report at p. 14.  The Court does not rely on that data in reaching its decision here as to irreparable harm, but notes it to show that a finding of lack of irreparable harm is also consistent with Honeywell's general financial condition.

[12]    Honeywell's total commitment over the life of the Trust, without a reduction to present value, was estimated by Dr. Rabinovitz to be $6.32 billion.  It should also be noted that at RFFCL ¶169 it was stated that the financial advisors for the NARCO Future Claimants' Representative had reviewed Honeywell's public financial reporting and concluded that Honeywell would have the ability to meet its future funding obligations to the Trust.

narrowly against only a single-year's cap amount for Honeywell contributions toward the Annual

Contribution Claim Fund ($150 million each for both 2015 and 2016), a $750,000 loss would be

only .5% of Honeywell's potential liability.

In other cases, courts have found irrecoverable losses of proportionally far higher

magnitude to be insufficient to demonstrate irreparable harm. *See, e.g., ConverDyn v. Moniz*, 68

F. Supp. 3d 34, 48–49 (D.D.C. 2014) (alleged loss of $10 million per year was not of sufficient

magnitude to show irreparable harm to plaintiff with annual revenues of $100 million). The Court

therefore is constrained to find a $750,000 unrecoverable loss to Honeywell to be *de minimus* in the

circumstances of this case. *Compare, Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 521 (D. Del.

1984) (daily unrecoverable loss of $11,000 incurred by plaintiff in complying with allegedly

unconstitutional state law represented on an annualized basis less than 1% of plaintiff's pre-tax

earnings and did not establish irreparable harm); *Phillips Petroleum Co. v. U.S. Steel Corp.*, 566 F.

Supp. 1093 (D. Del. 1983), *aff'd.* 727 F.2d 1120 (Fed. Cir. 1983) ($700,000 per year in

unrecoverable patent royalties that would have to be paid *pendente lite* did not constitute irreparable

harm where U.S. Steel made no attempt to show, nor had the court any reason to believe, that such

payments "would be in any way special, peculiar or onerous").

The Court thus finds that Honeywell has clearly failed to establish that a denial of

preliminary relief would lead to the sort of irreparable harm that is necessary in order to support the

issuance of a preliminary injunction. Since irreparable harm is a *sine qua non* for preliminary

injunctive relief, the Court could simply stop its analysis here and deny the *Motion. See, e,g.,*

*Maximum Quality Foods, Inc. v. DiMaria,* 2014 WL 6991967 (D. N.J. Dec. 10, 2014) (after finding

that plaintiff failed to show irreparable harm, denying application for TRO and preliminary injunction without considering the remaining 3 preliminary injunction factors). However, for the sake of completeness the Court will go on to examine the remaining elements.

### (B)   Likelihood of Success

To demonstrate a likelihood of success on the merits, Honeywell must make out a prima facie case showing a reasonable probability that it will prevail on the merits. *See, American Freedom Defense Initiative v. Southeastern Pennsylvania Transportation Authority*, 92 F. Supp. 3d 314, 321 (E.D. Pa. 2015).

In analyzing this element, the Court begins by reiterating what was previously noted, *i.e.*, to the credit of both Honeywell and the Trust, circumstances have substantially changed during the several months that have elapsed since the *Motion* was filed. The number of disputed claims have been significantly reduced and the Trust has decided it will no longer accept "check-the-box" or rote "form" affidavits as sufficient to support Expedited Review claims. Additionally, counsel for the Trust made the representation at the final argument on the *Motion* that even without a preliminary injunction the Trust would voluntarily refrain from employing a "refractory inference" in evaluating Expedited Review applications during the pendency of the case.

The Court understands the foregoing to mean that the Trust will not, as a matter of blanket policy, simply and uncritically accept a bare assertion that the claimant worked around refractory products as sufficient to meet the exposure standard under the TDP. Instead, the Trust will evaluate claim submissions on a case-by-case basis, considering the totality of evidence that is

presented in support of the claim and drawing inferences therefrom.  Finally, in an effort to address

transparency issues, the Trust has now instituted a "one-way mirror" system that purportedly allows

Honeywell to monitor the progress of individual claims as they proceed through the Trust's review

process.[13]  The Court finds that the Trust has made these changes and this commitment in good faith

and is willing to assume that it will act accordingly going forward.[14]

Unfortunately for Honeywell, solely in the context of considering the *Motion* but not

in the overall context of its concerns, an examination  of the likelihood of Honeywell succeeding

on the merits must be done based on the current circumstances, and not the circumstances as they

existed at the time the *Motion* was filed.  This follows from the well-recognized principle that a

court has the authority to modify an injunction when changed circumstances make the injunction

unnecessary or inappropriate.  *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 337 (3d Cir.

1993).  If the Court were to weigh Honeywell's likelihood of success using circumstances that no

longer pertain, any preliminary injunction that might be issued would be immediately subject to a

motion for modification.  To avoid such an absurd result the Court must therefore acknowledge and

apply the current circumstances.

---

[13]     The existence of this new "one-way mirror" system came up for the first time at the
closing argument.  Honeywell acknowledged its existence but said it did not have enough experience
or information to know how effective it would actually be in practice.  The Court is not here
insinuating that the one-way mirror will solve all transparency issues because there is no evidence
to support that, but at the very least it appears to be a step in the right direction.

[14]     The Order denying the *Motion* will be without prejudice, so that if at anytime during
the case Honeywell believes the Trust is not doing so it can again bring the matter to the Court's
attention.

The issues raised by Honeywell in the *Motion* ultimately come down to a determination by this Court as to whether the Trust is acting consistent with the TA and TDP in the way it is now interpreting and applying the exposure and competent evidence requirements. While the Trust was created as part of the Plan, pursuant to the authority conferred under *Section 524(g)*, the TA itself specifies that the Trust is intended to be a statutory trust under Chapter 38 of Title 12 of the Delaware Code, *12 Del. C. §3801, et. seq*. ("the Delaware Statutory Trust Act" or "DSTA"). *See*, TA at Art. 2.1. The TA even provides for the appointment of an additional "Delaware Trustee" if necessary to comply with the requirements of Delaware law. *Id.* at Art. 5.12. Furthermore, the TA provides that the Trust is to be "governed by, and construed in accordance with, the laws of the state of Delaware.'' *Id.* at Art. 8.13. *See also*, TDP at Section 7.4 (administration of TDP shall be governed by and construed in accordance with the laws of Delaware). None of the Parties have questioned the effectiveness of these choice of law provisions. It therefore appears that the Court must refer to Delaware law to determine what its role should be in reviewing the actions of the Trust.

The *Delaware Statutory Trust Act* provides:

> Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts

*Del. Code Ann. Tit. 12, §3809 (West)*. The Parties have not pointed to anything in the TA or the TDP that they contend alters Delaware law as to a court's role in reviewing the actions of a trust, nor do they contend that there is any applicable provision in the DTSA itself that would do so. At least for purposes of the *Motion*, then, the Court will proceed on the assumption that the general Delaware law pertaining to trusts is the law that must be applied.

24

The "seminal rule" of construction in trust cases under Delaware law is that the settlor's intention controls the interpretation of the instrument.[15]  *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1292 (Del. 1989).  Such intent is determined by considering the language of the trust instrument, read as an entirety, "in light of the circumstances surrounding its creation."  *Id.*  If after applying such analysis the conflict cannot be resolved, resort may be had to rules of construction. *Id; See also, In re Peierls Family Inter Vivos Trusts*, 77 A.3d 249, 263 (Del. 2013).

Under the TA, the settlors of the Trust are identified as NARCO, Honeywell, and ANH.  *See*, TA Art. 2.1.  It must nevertheless be recognized that in this particular instance the settlors did not simply create the Trust in a vacuum or a unilateral fashion.  The Trust was created in the context of a bankruptcy proceeding whose main purpose was to address the flood of asbestos-related tort litigation that was affecting NARCO, and by direct extension its parent Honeywell, after the breakdown of the cost-sharing agreement that had previously been in place between the two entities.  Extensive negotiations as to the terms of the Trust presumably occurred among the interested constituency groups before it was created, and representations as to what it would and would not do vis-a-vis future asbestos claimants were made to the creditors and the  Bankruptcy Court before it was approved as part of the confirmed Plan.  These are certainly "circumstances surrounding [the Trust's] creation" that the Court is required to be mindful of when interpreting the TA and the TDP.

---

[15]    It should be noted that the Parties differ as to whether the Court should review the actions of the Trust on a *de novo* basis, as Honeywell contends, or on an abuse of discretion basis, as the Trust contends.  *Compare*, Honeywell Post-Hearing Brief at 21–25 and Trust Post-Hearing Brief at 9–10.  The Court need not decide that issue at this time because it finds that even applying a *de novo* review standard there is insufficient evidence of record to demonstrate a likelihood of success by Honeywell.

The problem for Honeywell is that little if any admissible testimonial evidence was presented at the hearing on the *Motion* as to the circumstances surrounding the creation of the Trust. While there were some assertions by Counsel for Honeywell at the hearing and argument to the effect that Honeywell had agreed to the evergreen feature of the Trust only because of a very stringent claim review process embodied in the TDP, which process would absolutely preclude a claimant who was not in a presumptive occupation from making a recovery unless the claimant could name a specific NACP, admissible testimonial evidence from any witness who was actually involved in the process giving rise to the Trust was non-existent. Counsel's unsubstantiated representations are not evidence and the Court cannot accept them as such.

Relevant documentary evidence does exist in the record concerning the circumstances surrounding the creation of the Trust, and in the Court's view, it at least raises some questions as to whether the TDP was intended to be as strictly construed as Honeywell contends. For example, a Declaration by Peter M. Kreindler, who was then the Senior Vice-President and General Counsel of Honeywell, was submitted in support of the Disclosure Statement and Plan on May 23, 2006. *See* NARCO main case Doc. No. 4354.[16]  The Kreindler Declaration states that through January 4, 2002, approximately 290,000 asbestos plaintiffs had filed claims against NARCO, or against NARCO and Honeywell. Of those, approximately 75,000 had been dismissed, approximately 100,000 had been settled, and approximately 115,000 were still pending when the NARCO bankruptcy was filed. *See*, Kreindler Declaration at ¶14. Furthermore, in the vast majority of those

---

[16]     The Kreindler Declaration was referred to by Judge Fitzgerald in the RFFCL. *See Id.* at ¶ 16. Additionally, the Court is permitted to take judicial notice of docket entries in the case. *Nesseirotte v. Allegheny Energy, Inc.*, 2009 WL 230703 *5 note 7 (W.D. Pa. 2009).

claims "asbestos plaintiffs were ordinarily unable to provide sufficient detail to identify the specific

NARCO product to which they claimed exposure." *Id.* at ¶15.  Honeywell also submitted other

Declarations in support of Plan confirmation indicating that very few (< 5%) of the pre-petition

asbestos claimants provided any NARCO product information in their claims.  *See*, RFFCL at

¶¶72–75.  The documentary evidence thus seems to demonstrate that a large proportion of pre-

petition asbestos claims were being settled by NARCO/Honeywell even though in most, the

claimant did not name a specific NACP.  In interpreting the TDP, it would be important to know

whether there was an expectation that this same pattern would continue under the Trust, or whether

there would be a significant tightening of eligibility requirements that would reduce the proportion

of paid claims.

     The available documentary evidence also demonstrates that due to the product

naming practices used by NARCO it may not be easy for claimants to name a NACP.  For instance,

in a part of the Kreindler Declaration  explaining the dispute that NARCO and Honeywell were

having over which was responsible for particular claims pursuant to their cost-sharing agreement,

the following appears:

> c.  The parties' dispute was further exacerbated by the technical
> nature of the NARCO business' product naming conventions.
> NARCO frequently used a base name (e.g., Narcogun) for a
> "family" of products, and identified specific  products using
> suffixes composed of letters and numbers (e.g., Narcogun
> CM-343, Narcogun MCD-344, Narcogun SD-336).
> Similarly, there are at least six different Narcolite products:
> three of which contained asbestos, and three of which never
> contained asbestos.  All six names are similar: Narcolite,
> Narcolite Castable, Narcolite Insulating Castable, Narcolite

> 28, Narcolite 50, and Narcolite Gun.   Even in those comparatively fewer instances in which plaintiffs could provide additional details regarding the product purportedly at issue, they almost never provided more than a product's "family" name, which was insufficient information to allow NARCO and/or Honeywell to determine whether the product is or is not a "Discontinued Product" [which was a defined term under the cost-sharing agreement that determined which party was responsible for a claim].

*See*, Kreindler Declaration at ¶23(c).  This is certainly a relevant circumstance surrounding the creation of the Trust and it raises a number of potential questions.  Is it realistic to expect claimants to name a specific NACP in light of the NARCO product-naming practices?  If not, should the TDP be interpreted in a manner that could lead to a harsh and unreasonable result?  What does the phrase "specific asbestos-containing product manufactured, sold or distributed by NARCO" in Section 4.7(b)(1) of the TDP mean in light of the NARCO product-naming practices?  Does the required level of specificity required by the TDP lie at the level of an individual product (*e.g.*, Narcogun CM-343), or at a family of products (*e.g*., Narcogun), or at a class of products (*e.g*., "refractory products")?  None of these questions can be evaluated to the Court's satisfaction at this point in the case because of insufficient evidence as to the circumstances surrounding the creation of the Trust.

The other substantive issue raised by Honeywell in the *Motion* relates to the meaning of the term "competent evidence" in Section 4.7(b)(1) of the TDP with regard to the exposure evidence a claimant must submit.  Honeywell argues that the term should be given its "ordinary legal meaning," which it states is evidence that  would be "admissible" evidence in the courts.  It appears that Honeywell's chief concern in this regard is that, at least until recently, the Trust had not articulated any standard for determining what is competent evidence, and had not communicated any

instructions to CRMC as to how it should evaluate whether evidence meets the competent requirement.  Honeywell expressed particular concern that such a lack of any standard could lead to the acceptance of affidavits or other evidence that are based on hearsay, or even multiple hearsay, rather than any personal knowledge.  Honeywell does acknowledge that the situation has improved recently in that CRMC has added a dropdown menu on the claim web site for "personal knowledge," which Honeywell says is a tacit admission that the competent evidence standard requires personal knowledge.

This again appears to be an issue where the current circumstances as to how evidence is actually being reviewed is much less problematic than were the conditions that may have prevailed at the time the *Motion* was filed.  The Trust seems to have now acknowledged that there is an evidentiary standard under the TDP that must be applied and has taken steps to do so.  There is still disagreement between the Parties as to exactly what that evidentiary standard should be, but the divide has narrowed.

As to the particular question of whether "competent" evidence should mean only judicially admissible evidence as Honeywell argues, the answer is not clear.  Certainly, equating competent evidence with admissible evidence is one possible interpretation of the term.  On the other hand, the Trust correctly points out that in  approving the Plan the Court noted that the Trust offered claimants with legitimate claims a definite path to recovery without the intervening burdens of "prosecution and proof in the tort system."  That does suggest a more relaxed evidentiary regimen was intended for claims presented to the Trust but not a total elimination of certain, applicable standards.

Moreover, it is worth pointing out that, in addition to exposure evidence, the TDP also includes a requirement for "competent" medical evidence. *See,* TDP Section 4.7(a)(2). The term "competent" in Section 4.7(a)(2) is at least arguably defined, with a definition that includes not only judicially admissible evidence, but also such evidence "that is consistent with evidence submitted to NARCO and Honeywell to settle similar disease cases prior to the Petition date." In the absence of a conflicting definition in Section 4.7(b)(1), should that same definition be carried over to the exposure evidence standard? Under the presumption of consistent usage, perhaps so. *See, e.g., Dynetics, Inc. and Subsidiaries v. United States*, 121 Fed. Cl. 492 (U.S. Ct. Fed. Claims 2015) (term defined in one paragraph of contract would be given same definition in another paragraph). That could make the type of evidence that NARCO and Honeywell accepted to settle claims in the pre-petition period yet another circumstance surrounding the creation of the Trust that will need to be considered before the Court can make a determination as to the proper interpretation of the term "competent evidence."

In short, without a better grasp on the circumstances surrounding the creation of the Trust than the evidence to date has provided, the Court is not in a position at this point to interpret the TA and the TDP in accordance with the applicable standard required under Delaware law. Consequently, the Court cannot conclude that Honeywell is likely to succeed on the merits. *See, e.g., Bruni v. City of Pittsburgh*, 91 F. Supp. 3d 658 (W.D. Pa. 2015) (motion for preliminary injunction denied where there was insufficient evidence in the record to support a conclusion that plaintiffs established a likelihood of success on the merits); *Fonda Group, Inc. v. Erving Industries, Inc.*, 897 F. Supp. 230 (E.D. Pa. 1995) (preliminary injunction denied where agreement at issue was

30

susceptible of reasonable but conflicting interpretations and intention of parties needed to be developed more fully).

### (C)    Balance of Equities

In applying this factor a court should "consider whether granting the requested relief will result in greater harm to the party on whom it is imposed than its denial will have on the party who seeks it." *In re Advanced Marketing Services, Inc.*, 360 B.R. 421, 428 (Bankr. D. Del. 2007). This factor does not tip strongly in either direction. For the reasons discussed extensively above, the Court has already concluded that Honeywell will not suffer irreparable harm if the *Motion* is denied, and that in fact the harm it will experience can accurately be described as *de minimus* when viewed in the context of the overall financial commitment that Honeywell has made to fund the Trust. If the *Motion* were granted, the Trust *per se* (as opposed to affected claimants) would see little actual harm, that being the slight, temporary imposition on its power and discretion that a preliminary injunction would engender. Thus, as between the two main Parties to the case, the Court sees relatively little harm to them regardless of how the *Motion* is decided, and no strong differential in magnitude as to such harm. This factor is neutral under the facts of the case.

### (D)    Public Interest

Honeywell argues that the public interest favors granting preliminary injunctive relief because the public has a strong interest in seeing that contract rights are respected. That is undoubtedly true in a broad sense, but since the Trust and channeling injunction were both created

under the auspices of the *Bankruptcy Code*, and in particular *11 U.S.C. §524(g),* the public interest

in seeing that the intent of that statute is fulfilled must also be considered.  In *In re W.R. Grace &*

*Co.*, 729 F.3d 311, 323 (3d Cir. 2013), the court noted that Congress enacted *Section 524(g)* in part

because the long latency period of many asbestos-related diseases means that there will often be a

large but indefinite pool of future claimants whose disease has not yet manifested during a

bankruptcy proceeding.  Such future claimants are not in a position to protect their own interests and

Congress enacted the statute to protect their due process rights. *Id.* (Citing *In re Flintkote Co.*, 486

B.R. 99, 124 (Bankr. D. Del. 2012).  *Section 524(g)* does so by imposing certain requirements to

protect the rights of future claimants and then, if the requirements are met, channeling all present

and future  asbestos-related liability to a trust funded by the Debtor. *Id.*

If the  preliminary injunctive relief that Honeywell seeks was granted, it would

primarily, if not exclusively, affect the group of future claimants.  Having already  had their ability

to pursue Honeywell in the tort system abrogated by the issuance of the channeling injunction, and

having had the processing of their claims with the Trust effectively frozen for an extended period

by the voluntary "hold" agreed to by the Parties, many of these future claimants would now see their

ability to obtain a recovery from the Trust further delayed indefinitely while the Parties' litigation

battle proceeds.

If the Court were strongly convinced that Honeywell will ultimately succeed on the

merits, such a delay might nevertheless  be justifiable from a public interest standpoint.  However,

as has been discussed above, the Court has not been convinced as to that level of Honeywell's

prospects for success.  Given the uncertainty regarding the final outcome of the case, and

considering the Congressional concern for the due process rights of future claimants, the Court finds

that the public interest would be best served by a denial of the *Motion*.  While this denial will

potentially burden Honeywell in that between now and the end of the case some claims may get paid

that should not have been paid, the alternative of imposing an indefinite delay in payment on all

affected claimants would be worse.


## CONCLUSION


Although the Court is finding in favor of the Trust in this discreet matter, this result

should by no means be viewed as an endorsement of all of its actions to date.  Some of the evidence

that was presented at the hearing on the *Motion* did not reflect well on the Trustees' execution of

their duties in implementing the Trust.  There appears to have been a certain lack of transparency

by the Trust at the outset that perhaps contributed to Honeywell's suspicion of the Trust's activities.

A prime example was the confusing manner in which the so-called "refractory inference" was

adopted by the Trust.  The dual track that this took, with one hand of the Trust seemingly not

knowing what the other was doing, led Honeywell to believe, perhaps not unreasonably, that it was

being deceived by the Trust.  The evidence presented at the hearing demonstrated that the Trust was

not acting with any intent to deceive, and to its credit Honeywell thereupon retracted any allegation

in that regard, but at the very least the Trust's actions were sloppy.


Perhaps even more troubling to the Court than the initial lack of transparency was

the way that the Trustees seemed to farm out their fiduciary obligations to CRMC.  When questioned

as to their actions, a right clearly held by Honeywell under the TA and TDP, the Trustees appeared

to take on a somewhat arrogant course and "bunker mentality" toward sharing information with Honeywell. As well-compensated professionals, the Trustees should rightfully have been expected to take a very hands-on approach with such significant details as to what evidentiary standards would be employed in evaluating submitted claims. While it was certainly acceptable for the Trust to hire an entity like CRMC to assist in the processing of claims, there should never have been any doubt as to who was ultimately in charge. The Court got the sense that the Trustees were far too willing to just defer to CRMC when a procedural decision needed to be made rather than exercise independent judgment. Most notably, evidence was presented to show that after having agreed with Honeywell in mid-2014 to back off the refractory inference, the Trustees did a complete about face based solely on the contrary view of CRMC. Such unwarranted deference to CRMC would have been bad enough if CRMC was acting in a strictly neutral capacity, but the testimony at the hearing indicated that CRMC quite openly saw its role as being helpful to the law firms submitting claims to the Trust, which firms it viewed as its "customers."

Although collectively the trustees had amassed considerable experience in administering the typical asbestos trust situation, admittedly, the administration of an evergreen trust was a new endeavor for them. Possibly this explains the trustees' motivation in handling their fiduciary responsibilities prior to the institution of this litigation. Obviously, hindsight gives the Court the benefit of "20/20 vision" and since reopening this case, the Trust has been extremely cooperative in resolving many of the outstanding issues between the Parties resulting in a significant narrowing of the issues all as previously noted.

The decision on the *Motion* should also not be viewed as a foreshadowing of how the Court may ultimately rule on the merits of the claims raised in Counts I through IV of the Complaint.  As indicated above, the Court relies primarily on the lack of irreparable harm to Honeywell as its reason for denying preliminary injunctive relief, and secondarily on Honeywell's failure to show a likelihood of success on the merits because of insufficient evidence going to the circumstances surrounding the creation of the Trust.  The Court believes the current manner in which the Trust is processing claims is at least minimally protective of Honeywell's rights so as to permit a denial of the *Motion*, though this should by no means be taken as indicating one way or the other whether  the Trust's procedures will be found to be in full compliance with the TA and the TDP once a full evidentiary record has been presented.

For all of the above reasons the *Motion* will be denied without prejudice.  An appropriate order follows.

Dated: December 16, 2015

Thomas P Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:
    Hon. Judith K. Fitzgerald (Ret.), Tucker Arensberg, PC, 1500 One PPG Place, Pittsburgh, PA 15222
    All Counsel of Record

35

TDP Section 4.7(b) Exposure Evidence

**4.7(b)(1) In General**.      As set forth in Section 4.3(a)(3) above, to qualify for any Disease Level, the claimant must submit requisite evidence of exposure to a specific asbestos-containing product manufactured, sold or distributed by NARCO or its predecessors, which includes demonstrating both the presence of such products at a particular site at a particular time and the claimant's occupational exposure to that product. (If the claim is for secondary exposure, the claimant must demonstrate the occupational exposure of the person, such as a family member, through whom the claimant was exposed.)

Claims based on conspiracy theories that involve no exposure to an asbestos containing product produced by NARCO or its predecessors are not compensable under this NARCO Asbestos TDP. In order to demonstrate that a specific asbestos-containing product manufactured or distributed by NARCO or its predecessors was present at a site, a claimant must either: a) submit competent evidence that he or she worked at a site on the Worksite List, attached as Attachment B, during the identified period of time10; or, b) submit credible evidence (the foundation of which is established), that a specific asbestos-containing product manufactured or distributed by NARCO or its predecessors was present at a worksite at which the claimant was employed. In order to demonstrate exposure to the NARCO asbestos containing product at the relevant site, a claimant must submit competent evidence that he or she worked on a regular basis with the NARCO asbestos containing product or worked on a regular basis in close proximity to workers engaged in the activities set forth in Section 4.7(b)(2)(a) through (c).

**4.7(b)(2) Significant Occupational Exposure. "Significant Occupational Exposure"** means employment for a cumulative period of at least five years prior to December 1986 in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) installed, altered, repaired, removed, or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) or (c). There is presumptive Significant Occupational Exposure, provided the durational requirements set forth in the preceding sentence are met, for furnace construction and repair-related occupations in the iron, steel, aluminum, and glass manufacturing and electric power production industries.

**4.7(b)(3) Exposure Evidence**. The NARCO Asbestos Trust may consider as evidence an affidavit of the claimant, an affidavit of one or more Co-workers11 or the affidavit of a family member in the case of a deceased claimant, depositions, sworn interrogatory answers, invoices, construction or similar records, or other competent evidence. The NARCO Asbestos Trust can also

# — APPENDIX "1" —

require submission of other or additional evidence of exposure when it deems such to be necessary. In evaluating exposure evidence, the NARCO Asbestos Trust shall take into account any precedent set as a result of arbitration under Section 4.10 below, as well as the following factors:

(A) Industry/Occupation: NARCO had a specialized product line, manufacturing and distributing refractory products, for use in high heat applications. Because of the specialized nature and use of NARCO asbestos-containing product, the NARCO Asbestos Trust shall consider that there is a limited universe of occupations in a similarly limited range of industries in which claimants are likely to have been either directly or indirectly exposed to NARCO or its predecessors' asbestos-containing refractory products.

(B) Type of Industrial Exposure: The NARCO Asbestos Trust shall consider the lesser exposure to a NARCO asbestos-containing product of claimants with mixed industrial exposures. A claimant will have a "mixed industrial exposure" where he or she worked for some period of time in an industry where refractory products were typically used and in an occupation where direct or indirect exposure to such products was likely, and also worked for some period of time in an industry where exposure to non-refractory asbestos-containing products was likely.

Footnotes

10.   The "Worksite List" attached to this TDP is composed of sites that were either (1) included on the draft of the Worksite List acceptable to Honeywell as of February 23, 2005; or (2) locations at which both plaintiffs alleged, before the Petition Date in the tort system, that NARCO asbestos-containing product was present, and as to which NARCO, prior to the Petition Date, settled claims based upon the allegations of exposure at that location. The Worksite List acceptable to Honeywell as of February 23, 2005 sets forth the applicable date range for each site. The date range associated with each other site on the Worksite List is the earliest date of alleged NARCO exposure at a given site which NARCO settled pre-petition. The last date associated with each site is either the latest date of alleged NARCO exposure at that site which NARCO settled pre-petition plus ninety (90) days, or October 31, 1980. The "Worksite List" may be modified by the agreement of the NARCO Asbestos Trust Trustees, the NARCO Asbestos TAC, the NARCO Asbestos Future Claimants Representative, and Honeywell, consistent with the consent provisions of the NARCO Asbestos Trust Agreement, including Section 3.2(e).

11.   As used herein, "Co-worker" shall mean one or more individuals who provide competent sworn testimony (I) that the claimant worked with or around refractory products and (ii) that asbestos-containing products manufactured or distributed by NARCO were present at the worksite during the relevant period. A Co-worker's affidavit must provide evidence sufficient to show that the Co-worker meets this definition.